Central Illinois Company, Appellee, v. Charles F. W. Nichols, Appellant.

Gen. No. 38,446.

Opinion filed June 22, 1936.   Rehearing denied July 6, 1936.

HARRIS F. WILLIAMS and BURRELL J. CRAMER, both of Chicago, for appellant.

FISHER, BOYDEN, BELL, BOYD & MARSHALL, of Chicago, for appellee; EARL K. SCHIEK, of Chicago, of counsel.

MR. PRESIDING JUSTICE HALL delivered the opinion of the court.

On September 1, 1923, the defendant, Charles F. W. Nichols, executed the following instrument:

"$39,195.03    Chicago, Illinois    September 1st, 1923
    30604

"After date, and subject to the terms of a certain creditors' agreement of September 1st, 1923, I promise to pay to the order of Central Trust Co. Thirty Nine Thousand One Hundred Ninety Five and 03/100 Dol-

lars at the office of James Rosenthal, Chicago, Illinois. Value received.

No. 84                                   C. F. W. Nichols''

Thereafter, the following indorsements were placed on this instrument:

"Pay to order of Central-Illinois Company without recourse.

CENTRAL TRUST CO.
CENTRAL TRUST COMPANY OF ILLINOIS.
By E. B. Tilton,
Vice President

5/3/24 Pd. on a/c within note 979.88
8/9/25 Pd. on a/c within note 979.88
9/1/26 Pd. on a/c within note 783.90
(4 money stamps and seal)''

On September 1, 1923, the following document was executed:

"CREDITOR'S AGREEMENT DATED SEPTEMBER 1, 1923

"To Whom It May Concern:

"Some little time ago the writer was called into conference by Mr. Charles F. W. Nichols on account of financial difficulties that had arisen in the Charles F. W. Nichols Company.

"The writer, having been personally acquainted with Mr. Charles F. W. Nichols for twenty years, knowing of his integrity and great ability, was very glad to be able to be of assistance in any way that might be constructive and be of benefit to the advertising business in general.

"At the outset, the writer was anxious to know three things: The volume, the class of business, the profits.

"The volume exceeded a million and a quarter, the accounts were all high-grade and taken at card rates. The business suffered from lack of actual working capital.

"This, as the writer understands, was brought about not from losses that were made within the business, but because Mr. Charles F. W. Nichols, a little over two years ago, joined with three or four other men (all business men of high standing) in endeavoring to help a friend who had got into difficulties, but it seems that Mr. Charles F. W. Nichols and his friends who had joined with him had been deceived as to the affairs of the friend that they had lent their aid to, the result being very heavy losses to all concerned.

"Some of Mr. Charles F. W. Nichols' friends advised that he take advantage of the bankruptcy act, but it is only to the credit of his willingness to do the right thing that he refused to do this and refused to surrender his business which showed such wonderful progress and endeavored to pay off all of his debts, not only the legal debts but those that he considered moral, thereby burdening himself with bank indebtedness, and other matters that he was only indirectly associated with.

"Thus, in reducing his finances to nil, the profits of his business began to suffer, as he was unable to take all of his cash discounts and also unable to take on other new business that would necessitate additional working capital. He is now at a point where, unless he has sufficient capital, it would be useless for him to struggle with the situation any longer.

"After the writer's analysis, he has found that the business is fundamentally sound, so far as functioning as an advertising agency is concerned, with the exception that it lacks the necessary capital.

"Therefore, the writer is willing to enter into an agreement (without assuming any financial obligations) to supply $100,000 as a loan to the corporation and also supervise in such a way that the corporation will from that time forth pay all of its obligations on the cash discount day, providing that the following program is entered into.

"(1) That all of those having unsecured claims against the corporation accept Mr. Charles F. W. Nichols' personal note or notes, having the obligation lie with Mr. Charles F. W. Nichols only, and releasing the corporation of its present indebtedness.

"(2) Then there will be a trustee appointed who will have supervision over a trust fund for the purpose of liquidating the notes of Mr. Charles F. W. Nichols. This will consist of the following:

"(3) Mr. Charles F. W. Nichols will receive 5% of the billing, which on a million and a quarter a year would mean $62,500. Out of this Mr. Charles F. W. Nichols will receive his living expenses only, the balance to go to the trust fund, to be paid out pro rata each six months, all unsecured creditors being treated in the same and exact manner.

"(4) That the said Charles F. W. Nichols should be insured in the sum of $100,000.00 for the benefit of said trust fund, the premiums upon such insurance to be paid by the Charles F. W. Nichols Company, and not out of said trust fund.

"It is only fair to suppose after a careful analysis, that Mr. Charles F. W. Nichols, being relieved of his present worries and financial difficulties, will quickly increase this billing, as he has proved himself a very capable and very constructive advertising man, thoroughly understanding his business.

"The writer, having been in the advertising business for approximately thirty years, and having been successful, believes himself competent in analyzing a situation of this kind, and as he regards all of the publishers as his sincere friends, knowing that he would not under any circumstances recommend to a publisher that which he did not honestly believe would be fulfilled, he wishes to make this statement in this manner and in this manner alone can the publishers ever hope to get their money out of this business.

"It is a successful business and can be promoted along the lines outlined above so that no one will lose any money and in the opinion of the writer will be beneficial to the advertising world.

"Yours very truly,<br>
"Signed, E. H. Kastor

"We, whose names are undersigned, have unsecured claims against Charles F. W. Nichols Company, a corporation. Considering what is said in the foregoing letter by Mr. Kastor, and also considering the fact that we now have no claims against Charles F. W. Nichols personally, and believing the suggestions made by Mr. Kastor are for our best interest and for the best interests of all, we agree to accept and do accept the proposition as outlined by Mr. Kastor; in token of which we have signed our names hereto, giving the amounts of our respective claims opposite our signatures. We accept the notes of Mr. Nichols and shall look to him only for payment thereof."

Thereafter, and on the 1st of November, 1923, the following agreement was entered into, for the purpose of carrying out the above:

"TRUST AGREEMENT.

"(a) WHEREAS, CHARLES F. W. NICHOLS COMPANY, a corporation organized and existing under the laws of the state of Illinois, has been and is in financial difficulties, and

"(b) WHEREAS, H. W. KASTOR & SONS ADVERTISING COMPANY, a Missouri corporation licensed to do business in Illinois, E. H. KASTOR of Chicago, Illinois, CHARLES F. W. NICHOLS COMPANY, a corporation, of Chicago, Illinois, and CHARLES F. W. NICHOLS of Chicago, Illinois, did, on the first day of September, 1923, enter into a certain agreement in accordance with a certain proposition submitted to the creditors of the

NICHOLS COMPANY by E. H. KASTOR, the terms of which agreement have been accepted by a very substantial part of the creditors of the NICHOLS COMPANY, and

"(c) WHEREAS, it was stipulated in, the said agreement of September 1, 1923, that all of the unsecured claims against the said NICHOLS COMPANY should be assumed and taken over by the said CHARLES F. W. NICHOLS, personally, and that the said NICHOLS COMPANY should be released of all unsecured debts and claims of creditors existing prior to September 1, 1923, all such unsecured creditors to accept the personal notes of the said CHARLES F. W. NICHOLS, in accordance with and under the terms of the said agreement of September 1, 1923, and

"(d) WHEREAS, it was provided in said agreement of September 1, 1923, that 5% of the gross amount of all the billing done by the CHARLES F. W. NICHOLS COMPANY from and after the first day of September, 1923, shall be set aside and that twenty-five thousand dollars ($25,000) per year shall be paid in monthly installments to the said CHARLES F. W. NICHOLS for his services, and the remainder of such 5% should be turned over to a trust fund for the purpose of liquidating and paying off the said notes given by the said CHARLES F. W. NICHOLS in the assumption of the unsecured debts of the said CHARLES F. W. NICHOLS COMPANY, as such debts existed prior to the first day of September, 1923, and

"(e) WHEREAS, it was agreed by and between all of the parties to the said agreement of September 1, 1923, and the unsecured creditors of the said CHARLES F. W. NICHOLS COMPANY, existing prior to September 1, 1923, that the life of the said CHARLES F. W. NICHOLS should be insured in the sum of one hundred thousand dollars ($100,000) for the benefit of the said trust fund, the premiums upon such insurance to be paid by the NICHOLS COMPANY and not out of the said trust fund, and

"(f) Whereas, it has been agreed by the said Kastor Company, the said Nichols Company, the said Kastor, the said Nichols and a very large number of the said creditors, that Walter A. Strong, D. M. Deininger and James Rosenthal, all of Chicago, Illinois, may act as trustees of the said trust fund for the benefit of all of the creditors of the said Nichols Company, and

"(g) Whereas, the said Walter A. Strong, D. M. Deininger and James Rosenthal have signified and do hereby signify their willingness to accept the said trust and act as such trustees in behalf of all of the said creditors:

"(h) Now, Therefore, it is agreed as follows:

"(1) After the deduction of the payment of the salary of twenty-five thousand dollars ($25,000) per annum to the said Nichols, which salary is to be paid in equal monthly installments, the Nichols Company shall turn over to the trustees the balance of the said five (5%) per cent, computed upon the advertising billings, as provided for in said agreement of September 1, 1923. The said trust fund, as the same is received, shall be deposited by the trustees in such bank or banks as the trustees shall from time to time determine.

"(2) The said trust fund shall be distributed pro rata to the creditors of the Nichols Company, according to their respective claims, semi-annually, after deducting all necessary expense in connection with the administration of the trust, or such distribution shall be oftener if the trustees shall so elect.

"(3) A list of all the creditors who are to participate in such trust fund, showing their names and addresses and the respective amounts due to each of them, shall be prepared and certified as correct by the said Nichols Company and the said Nichols, and shall be delivered to the trustees as soon as possible after the execution of this trust agreement, and such list

must correspond with the evidence of indebtedness given by the said NICHOLS in pursuance of the agreement hereinbefore referred to, and such list shall control in the distribution of said trust fund unless the trustees shall find said list to be incorrect, in which event the trustees may correct the same.

"(4) Said trustees shall have the right and power to use so much of the said trust fund for such expenses as they may determine necessary in the administration of said trust, and they shall be the sole judges of the necessity of incurring such expenses and the amount thereof.

"(5) The said trustees shall have the right and power to pay the claim of any creditor or creditors which is less than two hundred dollars ($200) out of the said trust fund in full if they think it advisable and best for the interests of all parties concerned, and they shall also have the right and power to compromise or settle any claim for less than the amount thereof if in their opinion they consider it for the benefit of and to the interest of all the parties concerned, and such payments, compromises or settlements said trustees may make at their discretion at such times as they think advisable, and they shall be the sole judges as to whether such payments, compromises or settlements are for the benefit or advantage of all concerned.

"(6) All payments out of said trust fund shall be made by check upon the depository or depositories of said fund in such manner and upon such signatures as the said trustees may from time to time determine.

"(7) The trustees shall not be required to verify the correctness of the accounting by the said NICHOLS COMPANY as to the amount or amounts turned into the trust fund by the said NICHOLS COMPANY, but shall have the right to verify the same from the books and records of the said NICHOLS COMPANY, and for such purpose shall have the right to employ such public ac-

countant or accountants, or expert accountant or accountants as the said trustees may select at the expense of the said trust fund, and shall have the right to accept the report of such accountant or accountants which may be furnished to said trustees by the said NICHOLS COMPANY relating to such accounting, and the said NICHOLS COMPANY agrees to furnish to said trustees semi-annually, or oftener if requested, an accountant's report as to the amount due or to become due the said trust fund, and the said trustees shall be held accountable only for the money turned over to the said trust fund by the said NICHOLS COMPANY, or from any other source.

''(8) The trustees. shall not be liable for errors of judgment in acquiring, managing, holding or transferring any of the property of this trust, nor for any act or omission to act performed or omitted by them in the execution of this trust in good faith, nor shall they nor any or either of them be liable for the acts or omissions of each other, or of any agent or servant appointed by or acting for them, and they shall not be obligated to give any bond to secure the due performance of this trust by them, and said trustees shall not be liable individually or collectively in any event, except for their own willful and intentional breaches of the said trust.

''(9) In the event of the resignation of any of said trustees, or the inability of any trustee to act, or in the event of the death of any of the trustees, the survivor, or the surviving trustees shall have the right to fill such vacancy.

''(10) In case of the' death of the said CHARLES F. W. NICHOLS the said trustees shall collect the amount due them as such trustees under any insurance policy or policies then in force for such purpose on the life of the said NICHOLS, and after deducting the expense of collecting such insurance money and procuring the

same for the trust fund, such amount as may be so obtained and brought into the said trust fund shall be distributed in the same manner as herein provided for the distribution of the said trust fund, and the said NICHOLS COMPANY does hereby agree to turn over to the said trustees, during the life of said NICHOLS, such insurance policies as may be taken out in favor of the said trustees as beneficiaries, and will from time to time turn over to the said trustees the premium receipts showing the payments of premiums upon such policies, but the said trustees shall not be liable or responsible for the failure of the payment of premiums upon such policies, nor for the cancellation of any such policies, but may, in case of neglect or failure to pay the premiums on any such policies, pay the same out of the said trust fund, and recover the amount so paid from such party or parties that have undertaken the obligation to pay the same, and the said trustees may, if in their discretion they deem it advisable and for the best interests of the creditors, obtain and accept the cash surrender value of the said policies for the benefit of the said trust fund.

"(11) In the event of the death of the said CHARLES F. W. NICHOLS before the said notes given by the said NICHOLS, in the assumption of the unsecured debts of the NICHOLS COMPANY, have been fully paid, the five per cent (5%) of the gross amount of the NICHOLS COMPANY's billings over and above twenty-five thousand dollars ($25,000) per year shall continue to be turned over to the said trust fund until all of said notes of the said NICHOLS shall have been paid.

"(12) The said trustees shall act until the said creditors of said NICHOLS COMPANY shall be paid in full, unless by reason of some unforeseen contingency no money can be further obtained or collected under this agreement, in which event the balance of the trust fund on hand, after the deduction of all necessary expenses, shall be distributed among those entitled there-

to, and upon such distribution of such balance of the trust fund this trust shall be terminated and the trustees discharged.

"(13) The trustees shall have the power to determine all questions and doubts arising in relation to any of the provisions hereto, and after such determination, whether made on a question actually raised or implied in the actions and proceedings of the trustees, shall be conclusive and shall bind all persons interested herein.

"(14) The act or acts of the majority of the trustees shall be binding upon all the trustees in the performance and carrying out of this trust agreement.

"(15) This agreement shall be binding upon all of the parties hereto and their respective heirs, legal representatives, successors and assigns.

"IN WITNESS WHEREOF, the said parties hereto have executed this agreement this first day of November, 1923.

"H. W. KASTOR & SONS ADVERTISING COMPANY,
"By E. H. Kastor, Secretary & Treas.
"ATTEST:
"E. H. KASTOR,
    Secretary.
"CHARLES F. W. NICHOLS COMPANY,
    By Charles F. W. Nichols, President.

| "ATTEST: | E. H. KASTOR |
|  | CHARLES F. W. NICHOLS |
| WALLACE MEYER, | WALTER A. STRONG |
| Secretary. | D. M. DEININGER |
|  | JAMES ROSENTHAL." |

The action here is predicated upon the first of the documents herein referred to, designated as the note of Charles F. W. Nichols. The action is by the Central-Illinois Company, the indorsee of the note. Judgment was given for plaintiff and defendant appeals. There is no question as to the amount of the judgment.

As stated by the defendant in his brief, his defense is that, under the terms of the various agreements referred to, ''the creditors of the Nichols Company were to release their claims against the company and accept the so-called notes of Mr. Nichols, payable subject to the terms of the creditors' agreement, in lieu thereof; all of which was done accordingly. The trust agreement was executed on November 1, 1923, for the purpose of carrying out the terms of the creditors' agreement. The business of the company went along for a while and payments were made on account of the so-called notes, given by Mr. Nichols, by the trustees named in the trust agreement. Although Mr. E. H. Kastor loaned money to the Nichols Company in excess of $100,000, the company did not continue to prosper, and, under date of April 29, 1932, in an equity suit brought by the North Avenue State Bank, one of the creditors against the trustees named in the trust agreement, and others, the trust agreement was terminated and the trustees and the other defendants, including Nichols, were discharged, it having been found to be impossible for any more money to be realized by the trustees out of the Nichols Company in accordance with the terms of the creditors' agreement and the trust agreement. Mr. Kastor lost $7,000 of the money he advanced to the Nichols Company. There being no possibility of the collection of any more money through the creditors' agreement and the trust agreement, it is the theory of the plaintiff that the plaintiff has the right to recover the balance of the so-called note from the defendant, personally. It is the theory of Charles F. W. Nichols, the defendant, that the so-called notes, executed by him to creditors of the Nichols Company, including the instant note, were and are a part of the creditors' agreement and the trust agreement, and were and are payable in accordance with the terms of the creditors' agreement and of the trust agreement,

executed in pursuance of the creditors' agreement, and that such 'notes' do not represent any personal obligation on his part independent of the said agreements, the said notes containing no provisions as to time or place for payment by Nichols personally, but providing only for payment 'subject to the terms of a certain creditors' agreement of September 1st, 1923,' and not otherwise, said creditors' agreement having provided for the execution of the trust agreement.''

The manner in which the ''trust agreement was terminated,'' as stated by defendant in his brief, was by a decree of the circuit court entered on the 29th day of April, 1932, in an action brought by the North Avenue State Bank against Rosenthal, Deininger, Strong, Nichols, Kastor, Charles F. W. Nichols Company and the E. H. Kastor & Sons Advertising Company. In that case, it appears from the recital in the decree that the North Avenue State Bank, the complainant therein, and one of the creditors of the Charles F. W. Nichols Company, had accepted a note exactly similar to the one sued on here, subject to the terms and conditions of the documents hereinbefore recited. In its decree, the court finds, among other things, that ''pursuant to and in accordance with the terms of said proposal, there was executed and delivered by Charles F. W. Nichols to the complainant on September 1st, 1923, a certain instrument in writing, commonly called a promissory note, evidencing the amount of the indebtedness to the complainant.'' Also, the following: ''The court further finds that none of the creditors of the said Charles F. W. Nichols Company has ever received any payment or payments from said Charles F. W. Nichols other than such payments as have been made through the trustees under said trust agreement.'' Prior to the termination of the trust agreement as reported in *North Avenue State Bank v. Nichols,* 252 Ill. App. 366, a suit at law was brought in

the circuit court of Cook county by the North Avenue State Bank against defendant on the note owned by the bank, and in that case, the defendant filed a plea in which is recited the agreements between the parties and the trust agreement hereinbefore referred to, and therein says:

"That it was the purpose and intent of the said Creditors' Agreement and the said Trust Agreement so entered into and accepted by and agreed to by the said unsecured creditors of the said Charles F. W. Nichols Company, a corporation, that the unsecured creditors, of which the plaintiff was one, by accepting and agreeing to said Creditors' Agreement and said Trust Agreement, will look solely to the said Trust Fund for the payment of the said instruments so delivered to and accepted by the unsecured creditors, and by said plaintiff herein who was one of them, and that said notes executed by the said Charles F. W. Nichols to the said unsecured creditors of which the plaintiff herein was one, were executed simply and solely for the purpose of evidencing the respective indebtedness due to the respective unsecured creditors of the said Charles F. W. Nichols Company, all of which was known to and agreed to by said plaintiff and the other unsecured creditors, and accordingly, the said plaintiff must look to the Trust Fund created under the Trust Agreement which was drawn pursuant to the Creditors' Agreement and in accordance with same, for its payment of said instrument sued upon, and that the said Charles F. W. Nichols, the defendant herein, is not personally liable to the said North Avenue State Bank, a corporation, plaintiff herein, upon the said instrument sued upon herein." To the plea filed, the plaintiff filed a demurrer, which, of course, admitted the averments in the plea. The demurrer was overruled, and in its opinion affirming the circuit court, this court said:

"It therefore follows that during the time the trust agreement remained in force plaintiff must look to the funds realized under the trust agreement for payment, and in the meantime cannot maintain an action thereon. Plaintiff having acquiesced in the trust agreement and having received payments thereunder covering a period of over five years, is not permitted to repudiate an agreement which he has for so long a time accepted and ratified. *National Time Recorder Co. v. Feypel,* 93 Ill. App. 170; *Globe Wernicke Co. v. Siegel Meyers School of Music,* 209 Ill. App. 529."

In the agreement of September 1, 1923, we find the following:

"(1) That all of those having unsecured claims against the corporation accept Mr. Charles F. W. Nichols' personal note or notes, having the obligation lie with Mr. Charles F. W. Nichols only, and releasing the corporation of its present indebtedness." Also, in the trust agreement, we find the following:

"That all of the unsecured claims against the said Nichols Company shall be assumed and taken over by the said Charles F. W. Nichols personally, and that said Nichols' Company should be released of all unsecured debts and claims of creditors existing prior to September 1, 1923, all such unsecured creditors to accept the personal notes of Charles F. W. Nichols." Further, it provides for the "paying off the said notes given by the said Charles F. W. Nichols in the assumption of the unsecured debts of the Charles F. W. Nichols Company." In the trust agreement, we also find the following:

"(11) In the event of the death of the said Charles F. W. Nichols before the said notes given by the said Nichols, in the. assumption of the unsecured debts of the Nichols Company, have been fully paid, the five per cent (5%) of the gross amount of the Nichols Company's billings over and above twenty-five thou-

sand dollars ($25,000) per year shall continue to be turned over to the said trust fund until all of said notes of the said Nichols shall have been paid.''

The decree dissolving this trust agreement was approved and accepted by the defendant here, and he is bound by it the same as any of the other parties to that suit, and he cannot consistently urge the defense that his promise to pay is made subject to the terms of an agreement to the annulment of which he became and was a party. It is our opinion that the termination of the trust agreement removed all conditions concerning his promise to pay, and that he is liable on the instrument sued upon. The judgment is, therefore, affirmed.

*Affirmed.*

HEBEL, J., and DENIS E. SULLIVAN, J., concur.